**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| S.A., *et al.*,<br><br>    Plaintiffs,<br><br>          v.<br><br>JERRY D. WEAST, *et al.*,<br><br>    Defendants. | Civil Action No. 8:11-cv-01137-AW |

## MEMORANDUM OPINION

Plaintiffs Daniel Adcock and Pamela Wasserman (the Parents), on behalf of their son S.A., filed this action under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et. seq.* against the Montgomery County Board of Education and Superintendent Jerry D. Weast (collectively MCPS).

On April 15, 2011, Administrative Law Judge Lorraine E. Fraser (the ALJ or ALJ Fraser) held that MCPS had provided S.A. a "free appropriate public education" as required by the IDEA.  This suit represents an appeal, under 20 U.S.C. § 1415(g), of the April 15, 2011 Decision and Order.[1]

Presently pending before the Court are Plaintiffs' Motion for Summary Judgment, Doc. 17, and Defendants' Cross-Motion for Summary Judgment, Doc. 22.  The Court has reviewed the motion papers and finds no hearing necessary.  *See* Md. Loc. R. 105(6) (D. Md. 2010).  For the reasons below, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendants' Cross-Motion for Summary Judgment.

---

[1] Citations to the decision of the Administrative Law Judge, Lorraine E. Fraser, are noted as "ALJ Decision at __."

## STATUTORY BACKGROUND

The identification, assessment and placement of students in special education is governed by the Individuals with Disabilities Education Act (IDEA).  20 U.S.C. §§ 1400 *et. seq.*; 34 C.F.R. § 300 *et. seq.*  The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A).  As a condition of federal funding, states are required to provide all disabled children with a "free appropriate public education" (FAPE).  20 U.S.C. § 1412(a)(1)(A) (2010); *see Bd. of Educ. v. Rowley*, 458 U.S. 176, 180–81 (1982).

A FAPE is implemented through an individualized education plan (IEP), which is designed by an IEP team.  20 U.S.C. §1414(d)(1)(B).  This team consists of school district educators and administrators, education experts, and the child's parents.  An IEP must be tailored to the particular needs of a child by: (1) identifying a student's present levels of academic and functional performance; (2) setting forth annual and short-term goals; (3) describing the specifically-designed instruction and services that will assist the student in meeting those goals; and (4) indicating the extent to which the student will be able to participate with children without disabilities in regular educational programs.  20 U.S.C. § 1414(d)(1)(A).

The *Rowley* Court has stated that a school board need not ensure a student has access to "the best education, public or non-public, that money can buy."  *Hessler v. State Bd. of Educ.*, 700 F.2d 134, 139 (4th Cir. 1983) (citing *Rowley*, 458 U.S. 176).  A student is not entitled to "all services necessary to maximize his or her potential."  *Id.*  Instead, a FAPE entitles a disabled student to an IEP that is "reasonably calculated" to enable the child to receive "some educational

benefit." *Rowley*, 458 U.S. at 204.  The Fourth Circuit has consistently applied *Rowley's* "some educational benefit" standard.

Furthermore, the IDEA requires that a student be placed in the "least restrictive environment," meaning that a handicapped student must be educated with non-handicapped students to the maximum extent appropriate.  20 U.S.C. § 1412(a)(5) (2010); 34 C.F.R. 300.114(a)(2)(i) & 300.114(a)(2)(ii) (2010).  According to the Fourth Circuit, "mainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with non-handicapped children *is not only a laudable goal but is also a requirement of the Act.*"  *DeVries v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989).

Lastly, the IDEA establishes detailed procedural safeguards for IEP development and review.  If the sufficiency of an IEP is at question, parents may notify the school district and enter into mediation.  20 U.S.C. § 1415(b)(6).  If the mediation proves unsuccessful, the parents are then entitled to bring a due process action before an impartial state or local administrative hearing officer.  20 U.S.C. § 1415(f).  A party aggrieved by the administrative officer's decision can then file a civil action in a state or federal district court.  20 U.S.C. § 1415(i)(2).

## FACTUAL AND PROCEDURAL BACKGROUND

S.A. is a twelve-year-old student diagnosed with dyslexia and Attention Deficit Hyperactivity Disorder.  He attended Highland View Elementary School (Highland View) in the MCPS system from kindergarten through third grade.  Subsequent to the diagnosis of his learning disabilities, S.A. was identified by MCPS as a student with a Specific Learning Disability, and he therefore qualified for an appropriate IEP under IDEA.

### A.      S.A.'s Fourth Grade Year (2009–10)

In December 2008 (2008 IEP), an IEP was developed for S.A.'s fourth grade year.  The

2008 IEP provided 4.5 hours of special education services per week: four 45-minute sessions per

week outside the general education classroom, two 30-minute sessions per week within the

general education classroom, and one 30-minute session per week of counseling services.  The

2008 IEP also included various daily accommodations, such as a human reader or recording for

verbatim reading, graphic organizers, preferential seating, and multiple or frequent breaks.

Disappointed with S.A.'s academic progress during his third grade year at Highland

View, the Parents decided to enroll S.A. for his fourth grade year at The Lab School, a non-

public day school for students with learning disabilities.  Shortly thereafter, the Parents withdrew

S.A. from MCPS for the 2009–10 school year.

On November 12, 2009, the Parents filed a due process complaint with the Office of

Administrative Hearings (OAH), requesting an administrative review of the 2008 IEP.  A

hearing was held over five days in April and May 2010.  On June 9, 2010, Administrative Law

Judge Susan A. Sinrod (ALJ Sinrod) issued a decision in favor of the Parents, ruling that the

2008 IEP was "not reasonably calculated to provide [S.A.] with academic benefit and denied

[S.A.] his right to a FAPE."  SA-57 at 67–68.  The ruling also deemed the Parents' unilateral

placement of S.A. at The Lab School to be appropriate.  *Id.*  Therefore, MCPS was ordered to

reimburse the Parents for tuition at The Lab School for the 2009–10 school year.  *Id.*

### B.      S.A's Fifth Grade Year (2010–11)

#### 1.      September 28, 2010 IEP

In March 2010, prior to an initial IEP meeting, the Parents reenrolled S.A. in The Lab

School for his fifth grade year (2010–11).  Nevertheless, the Parties still met to discuss S.A.'s

IEP for his fifth grade year.[2]  After this initial April 7 meeting, the Parties met again on August

20 and September 28, 2010 to discuss S.A.'s present levels of performance and whether S.A.

needed specially designed instruction in math.[3]

Pursuant to the IDEA, the September 28, 2010 IEP (2010 IEP) documented S.A.'s

present levels of performance as of September 2010.  These determinations were based on test

scores, report cards, and qualitative reports from teachers.  The 2010 IEP also articulated specific

goals in the areas of speech and language, written language, occupational therapy, reading,

organization, and behavior.  With the exception of math, the Parties agreed on the articulated

levels of performance and goals.  Additionally, the 2010 IEP articulated which special

educational services would be provided to S.A. to meet those goals and the extent to which S.A.

would interact with non-disabled students.

The 2010 IEP tripled the number of special education hours provided in the 2008 IEP

from 4.5 hours per week to roughly 14 hours per week.  Specifically, the 2010 IEP provided for

the following special educational services: five 90-minute sessions per week outside the general

education classroom, five 60-minute sessions per week within the general education classroom,

one 45-minute session per week of speech language related services, one 30-minute session per

week of occupational therapy, and one 30-min session per month of counseling support.  The

IEP also included various daily accommodations and supplementary aids, similar to those

included in S.A.'s previous IEPs.

---

[2] MCPS argues that the Parents' reenrollment in March indicates that the Parents never intended for S.A. to attend Highland View and attended IEP meetings for the sole purpose of receiving public funding for S.A.'s fifth grade year at The Lab School.  The Parents explain that they were open to S.A. attending Highland View, but needed to place a deposit with The Lab School in case they found the 2010 IEP inappropriate.  The Court, finding this point not dispositive of the issue at hand, takes no position.

[3] On August 23, 2010, the Parents waived their right to a completed IEP before the start of the 2010–11 school year.

### 2.     Second Due Process Complaint

On December 13, 2010, the Parents filed a complaint with the OAH, requesting an administrative review of S.A.'s 2010 IEP.  Specifically, the Parents alleged that MCPS had not proposed an appropriate IEP for S.A. and that they were entitled to reimbursement for S.A.'s tuition at The Lab School for the 2010–11 school year and prospectively for future years.

An administrative hearing was held before ALJ Fraser over five days in February and March 2011.  The ALJ heard witness testimony and reviewed exhibits submitted by both parties. As with the prior hearing adjudicating the 2008 IEP, ALJ Fraser addressed two issues: (1) whether the 2010 IEP offered S.A. a FAPE for the 2010–11 school year, and (2) if not, whether the Parents' unilateral placement of S.A. at The Lab School was appropriate.  On April 15, 2011, the ALJ held that the September 2010 IEP was "reasonably calculated to address [S.A.]'s identified needs and provide him with FAPE."  ALJ Decision at 18.  Consequently, the Parents were not entitled to tuition reimbursement for the 2010–11 school year.

### C.     Appeal Before Federal Court

On April 29, 2011, the Parents filed this action under the IDEA, alleging that MCPS failed to provide S.A. with a FAPE for the 2010–11 school year.  Compl.  On October 12, 2011, the Parents filed a motion for summary judgment.  Doc. 17.  MCPS opposed that motion and moved on its own behalf for summary judgment on December 5, 2011.  Doc. 22.

### STANDARD OF REVIEW

Motions for summary judgment in IDEA cases are procedurally unique in that a reviewing court must make an independent assessment of an IEP based on a preponderance of the evidence, while still giving due weight to the state administrative proceeding.  *See Rowley*,

458 U.S. at 206.  The Fourth Circuit has interpreted *Rowley's* "due weight" requirement to mean that the factual findings of an administrative law judge are considered *prima facie* correct if they are regularly made.  *See J.P. v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008).  After giving the administrative fact-findings such due weight, if appropriate, a reviewing court is free to decide the case on the preponderance of the evidence.  *See Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

Notwithstanding this modified de novo review process, general standards of review for summary judgment motions still apply in IDEA cases.  *See Bd. of Educ. of Frederick Cnty. v. I.S.*, 325 F. Supp. 2d 565, 578 (D. Md. 2004).  As such, summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986)).  Where, as here, cross-motions for summary judgment are filed, a court must "evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration."  *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

As this Court has expressed, plaintiffs in IDEA cases face an uphill battle for several reasons: (1) they carry the burden of proof in the administrative hearing and in the district court; (2) if the administrative findings were made in a regular manner and have evidentiary support, they are to be considered prima facie correct; (3) in according due weight to an ALJ's findings, the court owes deference to the ALJ's determinations of the credibility of witnesses; and (4) the court owes generous deference to educators.  *See Wagner v. Bd. of Educ. of Montgomery Cnty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004).

**LEGAL ANALYSIS**

The issue before the Court is whether the 2010 IEP was reasonably calculated to provide S.A. with a FAPE, or stated another way, whether the IEP enabled S.A. to receive "some educational benefit" within the least restrictive environment. *Rowley*, 458 U.S. at 200–01. If the 2010 IEP was inappropriate, the Court determines whether the Parents' unilateral placement of S.A. at The Lab School was appropriate. *See Florence Cnty. Sch. Dist. Four v. Carter*, 950 F.2d 156, 163 (4th Cir. 1991) (citing *Rowley*, 458 U.S. at 207).

The Court begins its analysis by determining whether the ALJ's factual findings are entitled to deference, focusing on the ALJ's process when fact-finding. After giving the ALJ's findings due weight, if appropriate, the Court then evaluates the IEP based on the preponderance of the evidence. *See Doyle*, 953 F.2d at 105. If necessary, the Court then addresses whether placement at The Lab School was proper.

## I. Deference Afforded to the ALJ's Decision

As previously discussed, if regularly made, an ALJ's factual findings are considered *prima facie* correct. *See J.P.*, 516 F.3d 254 at 259; *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P.*, 399 F.3d 298, 305 (4th Cir. 2005) ("[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were 'regularly made.'"). The Fourth Circuit has consistently held that "[w]hether an IEP is appropriate for purposes of the IDEA (i.e., whether it meets the relevant statutory definition of a FAPE) is a question of fact in our circuit." *G ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 303 (4th Cir. 2003).

In evaluating whether findings are regularly made, the proper inquiry concerns the *process* through which the findings were made. *See J.P.*, 516 F.3d at 259; *Doyle*, 953 F.2d at

105 ("[I]n deciding what is the due weight to be given an administrative decision under *Rowley*,

we think a reviewing court should examine the way in which the state administrative authorities

have arrived at their administrative decision and the methods employed."). In other words, when

determining whether to grant deference, reviewing courts are not concerned with how ALJs

express their rulings in their written decisions. *See J.P.*, 516 F.3d at 259. Similarly, the issue of

deference is unrelated to the substance of an ALJ's findings. *See id.* When factual findings are

reached through a process far from the accepted norm, they are not regularly made. *See id.*

(quoting *Z.P.*, 399 F.3d at 305).

The Parents argue that the ALJ's factual findings were not regularly made—and thus do

not merit deference—for two fundamental reasons. First, the ALJ insufficiently explained her

rationale and her reasons for dismissing the evidence and testimony presented by the Parents.

Furthermore, these unexplained conclusions failed to address the appropriateness of the 2010

IEP. Second, the ALJ failed to make any credibility or weight determinations about either

parties' witnesses. *See* Doc. 24 at 3. The Court rejects the Parents' contentions, holding that the

ALJ's findings were regularly made and thus entitled to deference.

### A.    Characteristics of Factual Findings

#### 1.    Level of Detail Required

According to the Parents, the ALJ's Decision "cannot plausibly fall within the norm of a

fact-finding process" because the conclusory decision lacked a sufficiently detailed analysis of

the ALJ's rationale.[4] This argument is problematic because case law has never articulated that

any particular level of detail is required in an ALJ's opinion. *See J.P.,* 516 F.3d at 262. In fact,

---

[4] As the Court will discuss *infra* Part II, it does not agree with the Parents' statement that the ALJ's Decision is
conclusory and insufficiently detailed.

"if anything, [Fourth Circuit] case law suggests that the level of detail required of a hearing officer is relatively low." *Id.* Although a more detailed analysis is always preferable, an ALJ's failure to meet this aspirational standard is no basis for concluding that his or her findings were not regularly made and thus not entitled to deference. *See id.*

Furthermore, the Fourth Circuit has already rejected the Parents' contention that "a bare legal conclusion. . . provides no justification for the presumption of correctness, not least because the ordinary safeguard of judicial review depends on having a reasoned written opinion." Doc. 24 at 5. In *J.P.*, the circuit court held that the district court failed to give the required deference to the hearing officer. *Id.* at 259. The court rejected the district court's reasoning that the officer's findings were not regularly made because the decision "did not provide a sufficiently detailed analysis of the hearing officer's resolution of the legal and factual issues [which] prevented the court from determining that the factual findings were regularly made." *Id.*

The circuit court explained that the district court's "criticisms [focused] on the manner in which the hearing officer expressed his view of the case" rather than the process through which the findings were made. *J.P.* at 260–61. According to the court, there was no indication that the hearing officer's process was anything but ordinary because he allowed both parties to present evidence and make arguments and because the record indicates that the officer resolved factual questions "in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.* at 260.

Here, there is no indication that the ALJ conducted an improper hearing. The Parents do not identify deficiencies in how the ALJ arrived at her decision or even which of the factual findings they believe were not regularly made. In short, they fail to forward any arguments regarding the ALJ's process in reaching her findings.

Instead, the Parents' allegations center on how the written decision is drafted and the substantive merits of the ALJ's factual findings.  They argue that the ALJ's findings were not regularly made because she inadequately explained the basis for her conclusions and neglected to discuss the testimony of their witnesses.  *See* Doc. 17-1 at 10; Doc. 24 at 2.

Again, this argument has already been rejected by the Fourth Circuit.  In *J.P.*, the Fourth Circuit held that the hearing officer's decision warranted deference even though the opinion did not explain what evidence the hearing officer found most important or why the officer was more persuaded by the school board's evidence.  *See id.* at 262.  In fact, the court held that the decision was sufficiently detailed despite the fact that only two findings addressed issues in dispute, and these findings were as "about as bare-boned as they could be."  *Id.*  Specifically, the hearing officer found that "[d]uring the 2004–2005 school year, J.P. made progress in speech and language, behavior, and academics . . . This progress was not minimal or trivial."  *Id.*

Notwithstanding the low level of detail required of administrative decisions, the ALJ Decision contained at least nine factual findings that concern this case's contentions.  *See* ALJ Decision at 11–13, 16.  More importantly, the level of detail in the ALJ's findings far surpassed that in *J.P.*  *See id.*  The ALJ's findings discussed S.A.'s multiple test scores, report cards, and expert evaluations.  *See id.*  The ALJ also evaluated S.A.'s progress in specific subjects and compared S.A.'s progress with his peers.  *See id.*

In addressing only how the Decision was drafted and the substance of the findings, the Parents misconstrue the standard for determining whether an ALJ's fact-findings were regularly made.  Moreover, the Court finds no evidence in the administrative record suggesting that the ALJ's findings were not regularly made.

### 2.     Findings on IEP's Appropriateness

The Court also rejects the Parents' characterization of the ALJ Decision as lacking in findings on the primary issue at hand: the appropriateness of the 2010 IEP.  Since much of the 2010 IEP is undisputed, the ALJ correctly characterized the issue in this case as relatively limited.  In evaluating the 2010 IEP, the ALJ properly focused her analysis on the disputed areas of the IEP: (1) the necessity of a math fluency goal; (2) the speech language services; and (3) the occupational therapy services.

The Parents acknowledge that the ALJ "*did* provide an appropriate and detailed deference and credibility analysis in the first part of her decision regarding the proposed related services." Doc. 24 at 8.  Such a discussion goes to the heart of determining the appropriateness of the 2010 IEP.  Based on the evidence presented regarding the disputed areas of the 2010 IEP, the ALJ made a clear ruling that "the Parents have not met their burden of proof and shown that MCPS's IEP was inappropriate." ALJ Decision at 30.

Furthermore, despite the Parents' contention otherwise, the ALJ made findings beyond the adequacy of the IEP's speech language and occupational therapy services.  For example, she considered the Parents' evidence regarding S.A.'s need to remain in a self-contained special education program, taking into account any anxiety about transitioning back to Highland View. The fact that the ALJ disagreed with the Parents' argument does not mean that the ALJ made no factual findings on the issue.  *See infra* Part II B.

### B.     Credibility and Weight Determinations

The Parents also claim that the ALJ's findings were not regularly made because she blindly deferred to MCPS.  They contend that the ALJ failed to acknowledge or thoroughly discuss their expert witnesses, providing no explanation as to why she gave their witnesses less

deference than MCPS's witnesses.  Doc. 17-1 at 11.  Specifically, the Parents assert that the Decision failed to discuss two of their expert witnesses, Dr. Eric Levine and Amy Mounce.  *See* Doc. 17-1 at 11–13; Doc. 24 at 3.  Moreover, they claim she insufficiently analyzed "much of the testimony from the parents' five expert witnesses."  *See* Doc. 17-1 at 14–16.  In fact, the Parents note that she ignored the testimony of ten witnesses who testified for both sides.  Doc. 24 at 9.  The Parents also claim that the ALJ mischaracterizes Dr. Gerson's testimony.  *See* Doc. 24 at 9.

In short, the Parents maintain that "the Decision makes no credibility or weight determinations about the [the Parties'] expert witnesses on the key issue in this case."[5]  Doc. 24 at 3.  As a result of this omission, "[o]ne can only assume that the ALJ gave complete deference to the school system witnesses because she ruled in favor of MCPS."  Doc. 24 at 7

Case law, however, undermines their proposition that findings are not regularly made if an ALJ fails to mention a witness's testimony.  In *Z.P.*, the circuit court held that a district court erred in not deferring to a hearing officer because "the decision did not adequately, *if at all*, consider the testimony of the School Board's three expert witnesses . . . ."  *Id.* at 305 (citing *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Palkovics ex rel. Palkovics*, 285 F. Supp. 2d. 703 (E.D. Va. 2003)) (emphasis added).  The Fourth Circuit explained that "what the district court identified as failings on the part of the hearing officer are not failings at all, much less failings of a degree that would warrant a wholesale rejection of the hearing officer's findings."  *Id.*

Similarly, an IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments.  *See J.P.*, 516 F.3d at 261; *Z.P.*, 399 F.3d at 306 ("*Doyle* . . . requires the *district court* to explain its reasons for rejecting the findings of the hearing officer; it does not

---

[5] As the Court will discuss *infra* Part II, it does not agree with the Parents' statement that the ALJ ignored the testimony and failed to make credibility determinations of the Parties' expert witnesses.  Nevertheless, even if the Parents' characterizations of the ALJ's treatment of witness testimony were true, they would still fail as a matter of law.

require the *hearing officer* to explain in detail its reasons for accepting the testimony of one witness over that of another."). In *J.P.*, the hearing officer's discussion of witness credibility was limited to the following statements: (1) all the witnesses were credible; (2) all the experts were qualified to testify within their fields; and (3) J.P.'s mother was a knowledgeable witness. *See id.* at 260 (citing *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 447 F. Supp. 2d, 553 (E.D. Va. 2006)). Yet, the circuit court found this sparse explanation sufficiently detailed to warrant deference. *See id.* at 260–61. In contrast, the ALJ's discussion on witness credibility was far more expansive. *See infra* Part IIA2, Part IIA3, Part IIB.

Furthermore, the Fourth Circuit has consistently held that an ALJ's implicit credibility determinations are entitled to the same deference as explicit findings. *See Z.P.*, 399 F.3d at 307 (citing *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327–28 (4th Cir. 2004)). Therefore, the Parents wrongly conclude that the ALJ's failure to mention a witness's testimony indicates that she ignored his or her testimony. Rather, by not addressing Dr. Levine or Ms. Mounce's testimony, the ALJ made an implicit credibility determination that is entitled to deference by the Court, *i.e.*, that Dr. Levine and Ms. Mounce's testimonies were not worthy of credibility and, thus, not worth discussing. *See* Doc. 27 at 10. This omission does not reflect blind deference to MCPS's witnesses. *See J.P.*, 516 F.3d at 261 (holding that a hearing officer's ruling that an IEP is adequate makes clear that the officer found the school board's evidence more persuasive).

Lastly, the Parents assert that the ALJ mischaracterized Dr. Gerson's testimony. This allegation not only undermines their stance that the Decision makes no credibility determinations, this contention attacks the substance of the ALJ's finding. This criticism of a finding's substance, rather than the process in which finding was made, is precisely the type of

argument rejected by the Fourth Circuit as insufficient to demonstrate that fact-findings were not regularly made.

## II.   Court's Determination of 2010 IEP's Appropriateness

Having determined that the ALJ Decision is entitled to deference, the Court proceeds to independently assess the appropriateness of the 2010 IEP.  In doing so, the Court bears in mind the following: (1) so long as the ALJ's factual findings have evidentiary support, they are considered *prima facie* correct; (2) the Court owes deference to the ALJ's determinations of the credibility of witnesses.  *See supra* Standard of Review.

The facts of this case begin where the facts in the prior case ended.  Following ALJ Sinrod's holding that the 2008 IEP failed to provide S.A. a FAPE for his fourth grade year, MCPS increased the hours of specialized services for his fifth grade year more than threefold. The Parents assert, however, that S.A. can only receive the educational benefit required by the IDEA through an intensive, full-time, self-contained program such as the one available at The Lab School.  *See* Doc. 17-1 at 2.  MCPS argues that the 2010 IEP was reasonably calculated to enable S.A. to receive the requisite educational benefit.  *See* Doc. 22-1 at 22.  The Parents bear the burden of proof in establishing the inappropriateness of the 2010 IEP.  *See Wagner*, 340 F. Supp. 2d at 611.

Furthermore, it is noteworthy that both Parties agree that ALJ Sinrod's Decision should be accorded great deference.[6]  The Parents explain that ALJ Sinrod's opinion is entitled to a lot weight "because of the process that it went through, the fact that it's an adjudication, but when you look at the specific facts of that pretty lengthy decision, it's pretty convincing too. . ."  Tr.

---

[6] Citations to the decision of the Administrative Law Judge, Susan A. Sinrod, are noted as "SA-57 at __."

892:19–23.  Similarly, MCPS explains that one context in which to view the case is "under the penumbra of Judge Sinrod's decision."  Tr. 903:12–14.

### A.        Some Educational Benefit

The *Rowley* Court held that a FAPE entitles a disabled student to an IEP that confers *some* educational benefit to the child, not one that maximizes the child's potential.  *See Rowley,* 458 U.S. at 204; *supra* Statutory Background.

In evaluating whether the 2010 IEP is "reasonably calculated" to provide S.A. the requisite educational benefit, the ALJ correctly characterizes the issue as relatively limited.  With the exception of math, the Parents do not object to the present levels of performance, goals and objectives, and accommodations articulated in the 2010 IEP.  The Parents' acceptance of the 2010 IEP's goals and objectives—which are intended to address S.A.'s specific needs—is particularly significant because "[t]he goals contained in an IEP are the standard against which any proposed placement is measured."  *Wagner*, 340 F. Supp. 2d at 613.

The Parents are also satisfied with the 2010 IEP's provision that S.A. receive 7.5 hours per week of special education, outside the general classroom, for reading and written language.  Since both parties are satisfied with the appropriateness of the undisputed areas of the 2010 IEP, in determining whether the 2010 IEP confers some educational benefit, the Court focuses its analysis on the disputed areas of the IEP: (1) the necessity of a math fluency goal; (2) the speech language services; and (3) the occupational therapy services.  The administrative record supports the ALJ's finding that the 2010 IEP provides S.A. with the requisite educational benefit.

### 1.     Math Fluency Goal

The Parties concur that S.A.'s present level of performance in math was mid-third grade. ALJ Decision at 20.  This is consistent with The Lab School's May 18, 2010 IEP, which stated that S.A.'s math instructional level was 3.5.  *See* SA-62 at 12.

Based on S.A.'s math ability and a review of quantitative data, the ALJ concluded that S.A.'s math fluency need could be addressed with the accommodations provided by the 2010 IEP.  Thus, inclusion of a math goal in the 2010 IEP was unnecessary.  Specifically, the ALJ reviewed quantifiable metrics, including S.A.'s Spring 2009 Maryland School Assessment score, report card, and April 13, 2010 Woodcock-Johnson III (WJ-III) test scores.

The Court finds no evidence in the record to disrupt this finding, especially considering the Fourth Circuit's holding that in assessing an IEP's appropriateness, "the courts should endeavor to rely upon objective factors, such as actual educational progress . . . ."  *MM*, 303 F.3d at 532.  Here, the ALJ relied on precisely the objective factors that the Fourth Circuit has emphasized as most appropriate.

### 2.     Speech Language Services

The administrative record supports the ALJ's finding that the speech language goals in the 2010 IEP were appropriate and that 45 minutes per week of speech language services was sufficient to address those goals.  The Parents' witness, Donna Pavluk, testified based on her June 8, 2009 testing of S.A.  MCPS witness, Ted Culler, based his testimony on a review of Ms. Pavluk's testing.  MCPS Speech Language Pathologist Leslie Speisman also provided a report reviewing Ms. Pavluk's testing.

The ALJ found Mr. Culler's testimony and Ms. Speisman's written conclusions more credible, thoroughly explaining her rationale.  *See* ALJ Decision at 24.  Her finding is supported

by ALJ Sinrod who, after listening to testimony from the same witnesses, "found the testimony of Ms. Speisman to be credible."  SA-57 at 43.  In particular, the ALJ questioned Ms. Pavluk's use of The Test of Language Competence-Expanded Level 2.  *See id.* at 22.  Although Level 2 is appropriate based on S.A.'s chronological age, the test's authors recommend the use of Level 1 for students with a history of learning disabilities.  The Court agrees that the use of Level 2 for S.A., who has an identified reading disability, is inappropriate.

Since the first hearing where ALJ Sinrod found that S.A. did not require speech-language services for the 2009–10 school year, the Parents have provided little, if any, new evidence concerning S.A.'s speech-language needs for the 2010–11 school year.  Ms. Pavluk's testimony was based on her June 2009 testing—which ALJ Sinrod found deceptively depressed—and information from The Lab School, including Eden Springer's March 2010 Speech and Language Report.  Of Ms. Springer's eight page report, seven pages rely upon Ms. Pavluk's June 2009 testing.  Only one page, which focuses on S.A.'s classroom performance, includes new information regarding S.A.'s speech-language needs.

Furthermore, the speech-language services provided in the 2010 IEP is comparable to the services provided at The Lab School.  Although The Lab School provides 90 minutes of speech language services a week—as compared to Highland View's 45 minutes—The Lab School's program includes reading services.  *See* Tr. at 929: 13–18, 930: 21–23.  Half of those 90 minutes is devoted to reading services, which likely accounts for the difference in hours between Highland View and The Lab School.  *See id.*

Consistent with *Doyle* and *ZP*, and based on an assessment of the record as a whole, the Court reaffirms the ALJ's decision to credit MCPS's witnesses.  The Court holds that the services provided in the 2010 IEP appropriately addressed S.A.'s speech language needs.

### 3.      Occupational Therapy Services

Similarly, the record also supports the ALJ's finding that the occupational therapy goal in the 2010 IEP was appropriate and that a 30-minute per month session of combined direct and consultative occupational therapy services was sufficient to address that goal.   The Parents' witness, Christine Chang, testified based on information from The Lab School's occupational therapist and limited additional testing, including the Jordan Left-Right Reversal Test, Grip and Pinch Strength testing, Handwriting Screenings, and Keyboarding Screenings.   Ms. Chang also expressed concern about S.A.'s visual perception, but data from vision testing was incomplete. MCPS witness, Teri A. Bell, testified based on a review of S.A.'s occupational therapy evaluations, an analysis of the information from The Lab School's occupational therapist, a review of classroom handwriting samples, and participation in S.A's IEP meetings.

The ALJ found Ms. Bell's testimony to be more persuasive than Ms. Chang's based on the limited data presented.   Specifically, the ALJ acknowledged that S.A. had some problems with letter reversal, handwriting speed, grip strength, and writing fatigue, but that these problems would not be best addressed by removing S.A. from academic subjects for weekly individual occupational therapy sessions.   Instead, the ALJ agreed with Ms. Bell's statement that S.A.'s occupational therapy needs were "not 'as significant as described' by Ms. Chang."   ALJ Decision at 27 (quoting Tr. p. 678).

Upon review of the administrative record, the Court concurs with the ALJ's finding regarding S.A.'s occupational therapy needs.   Based on similar testimony during the prior hearing, ALJ Sinrod found that S.A. did not require occupational therapy services during the 2008–09 school year.   The new evidence presented to demonstrate S.A.'s need for weekly occupational therapy services was incomplete and inconclusive.   The Court finds it significant

that The Lab School's IEP for the 2009–10 school year did not include occupational therapy services, and Ms. Chang was unable to demonstrate why the data presented was sufficient to warrant the addition of individual, weekly sessions to The Lab School's 2010–11 IEP.  SA-55. On the contrary, a monthly thirty minute session of direct and consultative services would have addressed the scope of S.A.'s occupational therapy needs, without taking additional time away from academic subjects on a weekly basis.

Mindful of *Doyle's* caution against reversing the credibility determinations of the trier of fact, the Court finds insufficient reason to reverse the ALJ's decision to credit Ms. Bell over Ms. Chang.  The Court holds that the services provided in the 2010 IEP appropriately addressed S.A.'s occupational therapy needs.

### 4.      Increased Hours of Special Education Services

In addition to evaluating whether the 2010 IEP sufficiently addressed S.A.'s needs with regard to the disputed goals and services, the Court briefly addresses the hours of special education services provided to S.A.  The Court notes the significant increase in the number of hours of special education services provided to S.A. from the 2008 IEP to the 2010 IEP. Although not dispositive, it is noteworthy that S.A.'s services increased from 4.5 hours per week in the 2008 IEP to 13 hours and 45 minutes per week in the 2010 IEP.[7]

This increase in hours of service is particularly significant since the primary, if not entire, reason ALJ Sinrod found the 2008 IEP inappropriate is because "the hours of service were insufficient to allow [S.A.] to achieve educational benefit considering his continuing difficulties."  SA-57 at 58.  ALJ Fraser reasonably found that increasing S.A.'s services by threefold remedied the 2008 IEP's deficiencies.

---

[7] This calculation excludes the 30 minutes of occupational therapy provided to S.A. every month under the 2010 IEP.

The IDEA requires an IEP to provide a "basic floor of opportunity that access to special education and related services provides." *Tice*, 908 F.2d at 1207. The Parents, on the other hand, advocate for a potential-maximizing education for S.A. In applying the correct "some educational benefit" standard, the Court holds that the 2010 IEP provided S.A. with the educational benefit as required by the IDEA.

### B.  Least Restrictive Environment

In addition to the requirement that an IEP confer some educational benefit, IDEA requires that the benefit must be provided in the least restrictive environment. In short, the child must participate to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C.A. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550.

The 2010 IEP provided that at Highland View, S.A. would participate with non-disabled students in academic, non-academic, and extracurricular activities for approximately 21 hours per week. For the remainder of the school week, S.A. would receive services outside the general education classroom. In contrast, at The Lab School, S.A. would have no interaction with students without disabilities.

The ALJ found "no evidence that [S.A.] cannot be educated with children without disabilities. ALJ Decision at 29. The Court finds record evidence supporting this finding and adopts it as its own. Additional factual findings in the record also support the conclusion that S.A. did not require an intensive, full-time, self-contained program, such as the one provided by The Lab School. Rather, S.A.'s placement at Highland View abided by the IDEA's requirement that a disabled student be mainstreamed into regular school programs to the greatest extent possible.

This holding is further supported by ALJ Sinrod's finding that "I have no doubt that [S.A.] *can be educated* in a public school setting." SA-57 at 61. ALJ Sinrod concluded that the 2008 IEP was inappropriate based on her finding that it was "implausible, based upon the evidence, that the addition of two more hours of special education services would provide [S.A.] with the 'basic floor of opportunity' necessary for him to obtain educational benefit." *Id.* at 60 (citations omitted). In short, ALJ Sinrod's criticism stemmed from the hours of services provided to S.A. in the 2008 IEP, not from a belief that the nature and severity of S.A.'s disability requires him to be segregated from non-disabled children for an entire school day.

In arguing that S.A. must be segregated from non-disabled students, the Parents emphasize S.A.'s anxiety about transitioning back to Highland View. Doc. 17-1 at 16. First, the Parents explain that returning to Highland View would require S.A. to attend four different schools within four years. As the ALJ identified, however, S.A. would actually have attended only two schools—Highland View and The Lab School—in that time period. *See* ALJ Decision at 29. In determining the number of schools S.A. would have attended, the Parents include his transition from one campus of The Lab School to another campus of The Lab School. *See id.* at 30. The ALJ explained that this transition reflects S.A.'s ability to change schools with little difficulty. *See id.*

More importantly, the number of transitions a child makes is not determinative of whether the child is placed in the least restrictive environment. Although transitions between schools are something to bear in mind, they do not enter the calculation when analyzing if an IEP offers a student some educational benefit in the least restrictive environment.

Second, S.A.'s mother testified that during his third grade year at Highland View, he was teased and bullied for being different. *See* Doc. 17-1 at 16. The Court finds little, if any,

evidence indicating that S.A. was teased or bullied at Highland View.  Rather, the record reveals that S.A.'s anxiety was related to academics, not with peer relations or other social/emotional interactions at Highland View.  *See* Doc. 21-1 at 18.  S.A.'s mother discusses S.A.'s anxiety primarily in the context of stress related to academic issues, not social interactions.  *See* Tr. at 61:22–65:16.

During the prior hearing, ALJ Sinrod did not find any indication of teasing or bullying. In fact, when Dr. Levine—the Parents' witness—testified in the first administrative hearing, he "opined that the Student's stress in his third year resulted from the fact that he was sensitive and bright and had a 'growing awareness of his place in comparison to his peers.'"  SA-57 at 54 (citations omitted).

Based on the administrative record, there is insufficient evidence of bullying and teasing to conclude that segregation from his non-disabled peers would have been the most appropriate course of action for S.A.  This is especially true considering Congress's preference towards mainstreaming disabled children with their non-disabled peers.  On the contrary, the evidence leads the Court to determine that the 2010 IEP will appropriately address S.A.'s anxiety.  By increasing the hours of special education services by threefold, and by providing one 30 minute session per week of counseling support, the 2010 IEP would appropriately address any anxiety that might surface due to S.A.'s academic challenges.

### C.    Post-IEP Evidence

Finally, the Parents assert that evidence of S.A.'s performance at The Lab School during the 2010–11 school year is relevant when determining whether the aforementioned IEP was appropriate.  The Court finds, however, that S.A.'s post-IEP evidence does not support the contention that the 2010 IEP failed to provide S.A. with a FAPE.

The Court first addresses the Parents' argument that S.A.'s Lab School Report for the first two quarters of the 2010–11 school year (2010–11 Lab School Report) revealed that he was progressing on all goals that had been introduced.  *See* Doc. 24 at 14.  For each objective, the report indicates a score ranging from 1–5 to reflect S.A.'s progress.  SA-116.  Yet, the 2010–11 Lab School Report's usefulness is negligible since S.A.'s Lab School Report for the 2009–10 school year is completely void of any progress notations.  *See* Bd-1A.  Absent information regarding S.A.'s proficiency level during the 2009–10 school year, the Court cannot meaningfully determine what progress, if any, S.A. made at The Lab School.  Even setting this issue aside, the Court also notes that with the exception of math—which has always been S.A.'s strongest subject—the majority of the 2010–11 Lab School Report's showed that S.A. was "developing [the] skill [with] inconsistent responses.  *See* SA-116.

More importantly, S.A.'s WJ-III scores do not indicate that S.A. requires the type and amount of instruction provided at The Lab School.  S.A. was tested in April 2010 and February 2011.  Bd-43.  Nevertheless, his test scores in February revealed progress only in broad math and applied problems in mathematics.  *See id.*  In fact, S.A.'s test score in passage comprehension actually decreased.  *Id.*  For the remaining fourteen subjects, S.A.'s scores remained the same for all intents and purposes.[8]  *See id.*

## III.   MCPS Funding for Placement at The Lab School

Since the Court holds that the 2010 IEP provided S.A. with a FAPE, the Court need not consider whether The Lab School is an appropriate placement.  Similarly, the Court need not address whether MCPS must reimburse, or prospectively fund, S.A.'s tuition at The Lab School.

---

[8] According to the Parents' witness, Ms. Mounce, a standard deviation in the WJ-III scores is seven points.  *See* Tr. at 299:1–8.  Therefore, any scores that differed by seven points or less are considered insignificant.  *See id.*

## **CONCLUSION**

For the aforementioned reasons, Plaintiffs' Motion for Summary Judgment is **DENIED** and Defendants' Cross-Motion for Summary Judgment is **GRANTED**.


__  September 26, 2012____                          _____/s/_____
              Date                                        Alexander Williams, Jr.
                                                          United States District Judge